**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| VENTURA CONTENT, LTD., an Anguilla corporation, *Plaintiff-Appellant/ Cross-Appellee*, v. MOTHERLESS, INC., a New York corporation; JOSHUA LANGE, an individual, *Defendants-Appellees/ Cross-Appellants.* | Nos. 13-56332 13-56970 D.C. No. 2:11-cv-05912-SVW-FMO OPINION |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted October 19, 2015
Pasadena, California

Filed March 14, 2018

Before: Andrew J. Kleinfeld, Johnnie B. Rawlinson,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Kleinfeld;
Dissent by Judge Rawlinson

## SUMMARY[*]

### Copyright

The panel affirmed the district court's summary judgment in favor of the defendants and its order denying attorneys' fees in a copyright case.

The plaintiff, a creator and distributor of pornographic movies, alleged that infringing clips were stored and displayed on defendants' website.

The panel held that the defendants qualified for the safe harbor defense set forth in the Digital Millennium Copyright Act. The material on the website was stored at the direction of users, who decided what to post. The defendants did not have actual or apparent knowledge that the clips were infringing, and they expeditiously removed the infringing material once they received actual or red flag notice of the infringement. The defendants also did not receive a financial benefit directly attributable to infringing activity that they had the right and ability to control. In addition, the defendants had a policy of excluding repeat infringers from the website.

The panel held that the district court did not abuse its discretion in not exercising supplemental jurisdiction over a California state law claim. The district court also did not abuse its discretion in denying an award of attorneys' fees to defendants.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting, Judge Rawlinson wrote that there were triable issues of material fact as to whether the defendants qualified for the safe harbor. Specifically, there were disputed issues regarding defendants' compliance with the requirement that they adopt, implement, and inform subscribers and account holders of a policy providing for termination of repeat offenders.

## COUNSEL

Peter R. Afraisabi (argued), Christopher Arledge, and John Tehranian, One LLP, Newport Beach, California, for Plaintiff-Appellant/Cross-Appellee.

David S. Richman (argued), Theodora Oringher PC, Los Angeles, California, for Defendants-Appellees/Cross-Appellants.

## OPINION

KLEINFELD, Senior Circuit Judge:

We address the safe harbor provision in the Digital Millennium Copyright Act[1] and conclude that the defendants are entitled to safe harbor.

## FACTS

This case was decided on summary judgment. Joshua Lange, the named defendant, owns, operates, and is the sole employee of his internet site, Motherless.com. The site contains over 12.6 million mostly pornographic pictures and video clips. The content generally has been uploaded by the site's users, and the uploaders may or may not have created the material. Motherless stores the content on servers that Lange owns. In 2011, the website had nearly 750,000 active users and about 611,000 visits daily.

No one has to pay Motherless or Lange anything to look at the pictures or watch the videos on his site. A "premium" subscription is available for viewers willing to pay in exchange for avoiding advertisements and enabling downloading, but only two in a thousand active users buy premium subscriptions. Motherless makes about 15% of its income from subscriptions, T-shirts, coffee mugs, and the like. The remaining 85% comes from advertisements.

When Lange started Motherless, he uploaded around 700,000 pictures and videos that users had uploaded to a site

---

[1] Pub. L. No. 105-304, § 202, 112 Stat. 2860, 2877–86 (1998) (codified at 17 U.S.C. § 512(a)–(d)).

he previously owned, Hidebehind.com. Since that initial upload, Motherless has gotten all of its pictures and videos from its users. It does not have any licensing deals with content producers. Motherless does not pay users for the pictures and clips they upload. Early on, members and premium members who uploaded a great deal of material got "credits" which they could exchange for premium subscriptions, T-shirts, and such. Motherless later expanded its award system so that members could also exchange credits for money, with each credit worth a nickel. One of the biggest uploaders, who uploaded over 300,000 videos and pictures, testified at his deposition that he made about $200 after Motherless allowed him to exchange credits for money. A user forfeits all his credits if he uploads a picture or video that violates the website's Terms of Use.

Users can upload up to 999 pictures and videos at a time. Each time that a user uploads a file, he receives a warning on his computer screen that says "Anyone uploading illegal images/videos will be reported to the authorities. Your IP address . . . has been recorded. Any images/videos violating our Terms of Use will be deleted." After the user has uploaded content, he can add a title and tag to it. Tags are words for which Motherless's search software will look when a user searches for particular content. Motherless does not edit, review, or approve file names, titles, or tags. It does maintain links to certain classes of content, such as "Most Viewed" and "Most Popular."

The Terms of Use posted on the site provide a "partial list of content that is illegal or prohibited," such as child pornography, bestiality, and copyright-infringing material. The Terms prohibit posting copyrighted material without the prior written consent of the copyright owner, and they invite

takedown notices for infringing material.  The website gives directions for emailing takedown notices.  Motherless also uses a software program that provides copyright owners with a link and password so that they can directly delete infringing material themselves, without having to send a takedown notice to Lange.

Lange explained at his deposition that he and an independent contractor review all the pictures and videos before they are displayed on the site.  Lange uses software that generates a thumbnail of each picture, and five thumbnails of each video clip at the 20%, 40%, 60%, 80%, and 100% time points in the clip (*e.g.*, for a two minute clip, at 24, 48, 72, 96, and 120 seconds into the clip).  Lange or his contractor look at each thumbnail for "obvious signs of child pornography, copyright notices, watermarks, and any other information that would indicate that the [material] contains illegal content or violates" the Terms of Use.  Lange spends three to six hours a day, seven days a week, looking at the uploads, and he estimates that he reviews between 30,000 to 40,000 images per day.  He looks at about 80 thumbnails per minute to keep up with the volume of uploads.  He deletes any violating material that he or his contractor spot.  Whenever he finds child pornography, he contacts the National Organization of Missing and Exploited Children so that criminal action can be instigated against the uploader.

Lange personally examines all copyright infringement notices, whether DMCA-compliant or not, and deletes any infringing content that he can find.  He locates infringing content using the URL, that is, the web address that appears at the top of the screen when an image or clip is on the screen.  The complainant identifies the material by the URL and Lange deletes it as quickly as he can, ordinarily within a

day or two.  He also sends an email to the user who uploaded the video or picture, notifying him that the uploaded material has been deleted.  Motherless uses software to prevent users from re-uploading previously deleted material.  Since 2008, Motherless has received over 3,500 takedown notices.  Lange has deleted over 4.5 million pictures and videos for violating Motherless's Terms of Use and estimates that 4% to 6% of the deleted files were for copyright infringement.

Motherless does not have a written policy instructing its employees on when to expel repeat infringers; there are no employees to instruct.  Lange personally terminates repeat infringers; the independent contractor does not terminate repeat infringers.  Termination is a matter of Lange's judgment.  He considers the following factors in deciding whether to terminate a repeat infringer: (1) the volume of complaints; (2) the amount of linked content in the complaints; (3) the timespan between notices; (4) the length of time the alleged infringer's account had been active; (5) the amount of total content the account has; (6) whether the user is maliciously and intentionally uploading infringing content or uploading content without knowing the source; and (7) whether the takedown notices were DMCA-compliant. Between 2008 and 2011, Lange terminated over 33,000 user accounts for violating the website's Terms of Use.  Lange estimated that he terminated about 4% to 6% of these users for possible copyright infringement, which would be between 1,320 and 1,980 users.

Ventura Content, the plaintiff, creates and distributes pornographic movies.  Ventura found 33 clips on Motherless from movies it had created and had not licensed to Motherless.  The infringing clips were anywhere from 20

seconds to 46 minutes long, mostly 15 minutes or longer. It is undisputed that the clips infringed on Ventura's copyright.

All the infringing clips were segments of Ventura movies, not merely pictures, and not the full movie. None of the clips contained anything to indicate that Ventura owned the copyright. A few had watermarks naming other websites, which appear to be other pornography aggregators, but there were no Ventura watermarks, credits, or other pieces of information suggesting in any way that Ventura owned the copyright. These clips were visited 31,400 times during the 20 months they were posted on Motherless. During this time, Motherless received about 600,000 visits per day, so the views of the Ventura clips were a minuscule proportion of the total views on Motherless.

Eight users uploaded the 33 infringing clips. Lange terminated two of these users by 2012 (after this litigation began), one for repeat copyright infringement. There is no evidence to show that whoever uploaded the Ventura material got any credits or other compensation for these uploads. Lange does not remember reviewing any of these videos. Ventura did not send DMCA notices or any other sort of takedown notice for the infringing material. Nor did Ventura remove the material itself, as Motherless's software link enabled it to do. Ventura's first notice of infringement to Motherless was this lawsuit.

After Lange was served with the complaint in this case, he asked Ventura to send him the URLs for the infringing clips so that he could delete them. Ventura did not respond the first time Lange asked for the URLs, so Lange asked again. Ventura answered his follow-up request. On the day

that Ventura gave Lange the URLs, Lange deleted the infringing clips.

Ventura sued Motherless and Lange for copyright infringement under federal law[2] and for unfair business practices under California law.[3] Ventura sought damages and an injunction, but the injunction claim became moot when Lange deleted all the infringing clips. The district court granted summary judgment in favor of Motherless and Lange on the federal copyright claim. It dismissed the state law claim without prejudice, declining to exercise supplemental jurisdiction over it. Motherless then moved for attorney's fees under 17 U.S.C. § 505, but the district court denied Motherless's motion.

## ANALYSIS

The Digital Millennium Copyright Act contains several "safe harbor" provisions that protect certain categories of copyright infringers if they meet the statutory conditions.[4] The short title for this statutory portion is the "Online Copyright Infringement Liability Limitation Act."[5] The central issue in this case is whether Motherless met the safe harbor conditions.

---

[2] 17 U.S.C. § 501 *et seq*.

[3] Cal. Bus. & Prof. Code § 17200 *et seq*.

[4] *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1025 (9th Cir. 2001); *see* 17 U.S.C. § 512(a)–(d).

[5] Pub. L. No. 105-304, § 202, 112 Stat. 2860, 2877 (1998).

Ventura contends that (1) the district court erred in granting partial summary judgment to Motherless on its safe harbor defense and (2) abused its discretion by declining to exercise supplemental jurisdiction over its state-law claim. Motherless (1) cross-appeals the district court's determination that it directly infringed on Ventura's copyrights and (2) separately appeals the district court's denial of attorney's fees. All but the first issue may be addressed summarily. With regard to the summary judgment on safe harbor, we review de novo, taking the evidence in the light most favorable to the non-moving party, Ventura.[6] Most of the material facts are undisputed. We assume without deciding that Ventura established direct infringement, because it is unnecessary to reach that issue. We review for abuse of discretion the district court's decisions not to exercise supplemental jurisdiction over Ventura's state-law claim and to deny Motherless attorney's fees under the Copyright Act.[7]

Much of Ventura's briefing draws our attention to the lurid sexual material on Motherless. And Ventura is suing to protect its own pornographic creations from infringement. But federal copyright law does not distinguish between pornographic and non-pornographic works, so the nature of the sexual material that Ventura creates and Motherless hosts is irrelevant.

---

[6] *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 265 (9th Cir. 1991).

[7] *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1187 (9th Cir. 2001) (supplemental jurisdiction); *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1180 (9th Cir. 2013) (attorney's fees); *see also* 17 U.S.C. § 505 (allowing the court "in its discretion" to award attorney's fees as part of costs).

## I.  Safe Harbor

The Digital Millennium Copyright Act places the burden of policing copyright infringement on the copyright owner, not on the person or firm storing and hosting the material.**[8]** It is undisputed that Ventura owned the copyrights to the 33 clips that were stored and displayed by Motherless.

The safe harbor clause at issue in this case, 17 U.S.C. § 512(c), provides as follows:

> (1) IN GENERAL.—A service provider shall not be liable for monetary relief . . . for infringement of copyright *by reason of the storage at the direction of a user* of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—
>
> > (A)     (i) does not have *actual knowledge* that the material or an activity using the material on the system or network is infringing;
> >
> > (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is *apparent*; or
> >
> > (iii) upon obtaining such knowledge or awareness, *acts expeditiously to*

---

**[8]** *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007).

*remove*, or disable access to, the
material;

(B)    *does not receive a financial benefit
directly attributable to the infringing
activity*, in a case in which *the service
provider has the right and ability to
control such activity*; and

(C)    *upon notification* of claimed
infringement as described in paragraph
(3), *responds expeditiously to remove*, or
disable access to, the material that is
claimed to be infringing or to be the
subject of infringing activity.[9]

Thus for a service provider to get safe harbor protection
despite its infringement, it must not know of the
infringement, and the infringement cannot be apparent. It
must also take down or prevent access to the infringing
material as soon as it learns about it or receives a DMCA
notice. And it must not directly benefit financially from the
infringement in situations when it can control the activity.

There is an additional condition on safe harbor eligibility:
the service provider must have a policy to terminate users
who repeatedly infringe on copyrights, and it must implement
that policy reasonably. The statute setting this condition,
17 U.S.C. § 512(i), reads as follows:

---

[9] 17 U.S.C. § 512(c)(1) (emphasis added). The added emphasis is to
highlight language that Ventura has put at issue.

CONDITIONS FOR ELIGIBILITY.—

(1) ACCOMMODATION OF TECHNOLOGY.—The limitations on liability established by this section shall apply to a service provider only if the service provider—

(A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures.

The overall scheme is plain enough at a superficial level. A service provider must delete or disable access to known or apparent infringing material, as well as material for which he receives a statutorily compliant takedown notice. He must also terminate repeat infringers when appropriate. The copyright owner, not the service provider, has the burden of policing infringement. But the service provider, to maintain its shield, must respond expeditiously and effectively to the policing. If these conditions are met, the service provider will not be financially liable for infringing material on his website. The details, of course, get complicated, and we must address those complications.

### A. "By reason of the storage at the direction of a user"

Section 512(c) says that, subject to additional conditions discussed below, a service provider will not be liable "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."[10] Ventura points out that Lange uploaded 700,000 files from his old site, screens uploads for illegal material before putting them on the site, and has his software categorize material into classes (such as "Most Popular"). Ventura would therefore have us conclude that the Motherless material was stored and made available "at the direction of" Motherless, not the users. We do not agree.

Lange did upload thousands of pictures and videos from his old site, Hidebehind.com, when he first established Motherless in 2008. However, those uploads amount to only 6% of what the site now carries. He has not uploaded any material to the site since he started it with his old material. Lange and his contractors did not upload any of the 33 clips over which Ventura claims copyright ownership. There is no evidence that any of the Hidebehind.com tranche infringed on anyone's copyright. That material therefore does not establish liability here.

Ventura also argues that Lange is not entirely passive because he screens out child pornography, bestiality, and copyright infringement that he spots. The argument is that by screening out this material, Motherless effectively directs what is posted instead of enabling posting "at the direction of

---

[10] 17 U.S.C. § 512(c)(1).

a user." But Ventura cites no authority for the unlikely proposition that screening out illegal material eliminates the safe harbor shield. Indeed, section 512(m) says that the law should not be construed to eliminate the safe harbor because a service provider monitors for infringement or disables access to material where the conduct depicted is prohibited by law.[11] Motherless screens out child pornography because it is prohibited by law. It screens out bestiality because a few European countries prohibit bestiality pornography by law, and some of Lange's European advertisers voiced concerns about this content. We find it counterintuitive, to put it mildly, to imagine that Congress intended to deprive a website of the safe harbor because it screened out child pornography and bestiality rather than displaying it. Instead, we read section 512(m) to say that Congress expressly provided that such screening does not deprive a website of safe harbor protection.

Finally, Ventura argues that because Motherless groups together the tagged videos and pictures so that users can find

---

[11] 17 U.S.C. § 512(m) reads as follows:

> (m) PROTECTION OF PRIVACY.—Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on—
>
> (1) a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i); or
>
> (2) a service provider gaining access to, removing, or disabling access to material in cases in which such conduct is prohibited by law.

what they want, it is Motherless, rather than the user, who directs the "storage." But Lange testified, and Ventura does not dispute, that his editorial principle is as announced on the site: "anything legal stays." Ventura merely argues that this case can be distinguished from opinions which applied the safe harbor to sites that screen and alter content.

Our controlling case is *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*.[12] There, we addressed whether a website that enabled sharing music videos, some of which turned out to be infringing, was entitled to safe harbor.[13] The videos in *UMG* were not just stored, as one might store family photographs on a "cloud" service such as iCloud, Dropbox, or Google Drive. Users uploaded material and watched and listened to videos and songs.[14] Some of the music was infringing.[15] We held in *UMG* that the phrase "by reason of the storage at the direction of a user" covers more than "mere electronic storage lockers."[16] It allows service providers to perform access-facilitating processes such as breaking up the files for faster viewing and converting them to a Flash format.[17]

---

[12] 718 F.3d 1006 (9th Cir. 2013).

[13] *Id.* at 1011–12.

[14] *Id.*

[15] *Id.* at 1013.

[16] *Id.* at 1016 (quoting *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081, 1088 (C.D. Cal. 2008)).

[17] *See id.*

As in *UMG*, Motherless's users, not the website, decide what to upload and what file names and tags to use.[18]  Our holding in *UMG* disposes of the argument that altering the file format to make it accessible before posting, and enabling users to apply search tags to uploads, takes the posting of the content out of the "at the direction of a user" definition.  It also disposes of the argument that being anything more than an electronic storage locker, such as by facilitating user access to files that other users posted, deprives the website of safe harbor protection.

Ventura argues that by using software to highlight the "Most Popular" material, and by giving credits to users who post the most popular material, Motherless is posting at its own direction rather than hosting material posted at the direction of the user.  This argument is inconsistent with our holding in *UMG*.[19]  It is also inconsistent with the meaning of the words "at the direction of the user."  The users post what they post, popular or not.  Motherless does not screen out material for relatively low popularity, and of course most postings do not fall within the "Most Popular" category.  Yet there they are, up on the site, because the users put them there.  We do not see how the Motherless incentive program, which makes credits usable to buy coffee mugs and T-shirts and such for high volume uploaders, makes "storage" at the direction of Motherless rather than "at the direction of a user."  Whether the uploader does so for the glory of the thing (Motherless's biggest uploader testified that he wanted his name on the leaderboard for big uploaders) or for a coffee mug, his craving for such fame and fortune as was available

---

[18] *See id.* at 1012.

[19] *See id.* at 1016, 1019 & n.10.

does not mean that the specific content he uploaded was directed by Motherless, rather than "by the user."

We recently addressed the phrase "by reason of storage at the direction of the user" in *Mavrix Photographs, LLC v. LiveJournal, Inc.*[20]  The website in *Mavrix* was not entitled to summary judgment on the safe harbor issue because there was a genuine issue of fact as to whether the storage of material on the site was at the direction of the site or at the direction of its users.[21]  The *Mavrix* website used moderators to review user submissions for substance.  It published only those submissions that, in the moderators' judgment, were "relevant to new and exciting celebrity news."[22]    We remanded because genuine issues of material fact remained as to "whether the moderators were LiveJournal's agents."[23]  We restated in *Mavrix* what we had held in *UMG*: "Infringing material is stored at the direction of the user if the service provider played no role in making that infringing material accessible on its site or if the service provider carried out activities that were 'narrowly directed' towards enhancing the accessibility of the posts."[24]    And we further noted that section 512(m) of the statute expressly provided that deleting

---

[20] 873 F.3d 1045, 1052–57 (9th Cir. 2017).

[21] *Id.* at 1056–57.

[22] *Id.* at 1050.

[23] *Id.* at 1057.

[24] *Id.* at 1056 (quoting *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081, 1088 (C.D. Cal. 2008)) (citing *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1018 (9th Cir. 2013)).

unlawful material did not deprive the site of safe harbor protection.[25]

The case before us falls within *UMG*, not *Mavrix*.  The moderators in *Mavrix* directed posting only if they thought the user-submitted material was "new and exciting celebrity news."[26]  Lange and his contractor do not review whether the pornography submitted by users is "new and exciting" or meets any other discretionary standards.  The Motherless rule is "anything legal stays."  Lange does not exercise judgment in what to host.  His editing is limited to the kind protected by section 512(m), screening out illegal material.

Perhaps if Lange's site were flooded with pictures and videos of kittens playing with yarn, he would change his rule and exercise judgment about whether the material was pornographic enough to host, but that is speculation.  We have been directed to nothing in the record that establishes a factual dispute about whether Lange actually exercises judgment about what to host beyond his screening out child pornography, bestiality, and infringing material.  Though Motherless has groups, posts need not be placed into a group to be stored on the website.  None of Ventura's infringing clips were selected or listed under any of Motherless's groups, but all of them were posted anyway.

Although *UMG* compels our holding, we also note that our sister circuits agree with the critical point that "storage at the direction of a user" affords safe harbor protection to sites where users can look at other users' uploads, not just to what

---

[25] *Id.*

[26] *Id.* at 1050.

*UMG* called "electronic storage lockers."[27]   The Second Circuit ruled in *Viacom International, Inc. v. YouTube, Inc.*[28] that YouTube was entitled to safe harbor—even though it converted user-submitted videos into a standard display format and used an algorithm to suggest related videos—because "to exclude these automated functions from the safe harbor would eviscerate the protection afforded to service providers by § 512(c)."   Likewise, the Fourth Circuit held in *CoStar Group, Inc. v. LoopNet, Inc.*[29] that a real estate listing website that allowed subscribers to post listings was not liable for copyright infringement even though an employee cursorily reviewed the photographs for infringing material.   The *CoStar* majority analogized the service provider to an owner of a traditional copy machine "who has stationed a guard by the door to turn away customers who are attempting to duplicate clearly copyrighted works."[30]   And the Tenth Circuit held in *BWP Media USA, Inc. v. Clarity Digital Group, LLC*[31] that a news site that relied on user-generated content was entitled to safe harbor even though it instructed users on topics to write about and suggested that users include pictures or slide shows with their articles. Citing to *UMG*, the Tenth Circuit explained that "if the infringing content has merely gone through a screening or

---

[27] *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1016 (9th Cir. 2013).

[28] 676 F.3d 19, 39 (2d Cir. 2012).

[29] 373 F.3d 544, 546–47 (4th Cir. 2004).

[30] *Id.* at 556.

[31] 820 F.3d 1175, 1181 (10th Cir. 2016).

automated process, the [service provider] will generally benefit from the safe harbor's protection."[32]

Because the users, not Motherless, decided what to post—except for Lange's exclusion of illegal material and his original upload when he created the website—the material, including Ventura's, was "posted at the direction of users."

## B.  Knowledge and Expeditious Takedown

Though the statutory scheme places the burden of policing infringement on the copyright owner, the scheme does not allow a website owner to avoid responsibility for knowingly selling pirated material by deleting a particular posting only when he gets caught.   Instead, the statute excludes blatant pirates from the safe harbor by requiring that a service provider:

> (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material.[33]

---

[32] *Id.* (citing *UMG*, 718 F.3d at 1020).

[33] 17 U.S.C. § 512(c)(1)(A).

If the website provider actually knows that the material for which relief is sought is infringing, or if the infringement is "apparent," he remains liable if he does not expeditiously remove the material upon gaining knowledge.

### i.  Actual Knowledge

Ventura and its expert argue that Lange must have had actual knowledge that the Ventura clips infringed on its copyright because they appeared to be professionally produced and because a few had watermarks. That argument is unavailing.

According to Ventura, because Lange reviewed all of the material that users submitted, he would have seen that four of the 33 clips had watermarks. But none of the watermarks establish actual knowledge of infringement because Ventura did not watermark its clips. The watermarks on the four clips said "videosz.com" and "monstercockbabes.com," suggesting the clips came from pornography aggregators rather than copyright owners. The watermarks gave no hint that Ventura owned the material, and they do not establish a genuine issue of fact about whether Motherless knew the material was infringing.

Ventura also argues that Motherless had to know the clips were infringing because, it claims, the high quality of the videos showed professional production. But the conclusion does not follow from the premise. Professionally created work often is posted online to publicize and attract business for the creator. Amateurs often do professional quality work in artistic endeavors, and amateurs are no less entitled to copyright protection than professionals, so it is not apparent why professionalism matters. And digital cameras have

become so good and so easy to use that even home movies of children's birthday parties can look professionally done.

Nor do we see what on the Ventura videos distinguishes them from amateur creations. Many of the clips include shaky camera footage and poor lighting. One starts with a camera bouncing around taking pictures of the interior of a car, has a voiceover saying "figured out how to finally turn this thing [the camera] on," and so forth. We have no idea how it would be possible to recognize "professionals" from amateurs on the videos, and Ventura has not provided any factual information to help us. It is hard to see what distinguishes Ventura's videos from homemade work uploaded to the internet by the rightful owner, and it is even harder to see why it would be obvious that the Ventura videos were infringing. An ordinary person who had not studied movie-making and personally made movies would likely be oblivious to the professionalism that the expert report identifies. This is not to criticize the quality of Ventura's videos. The apparent amateurism may be a skilled professional means of giving them an appearance of authenticity. But nothing about their professionalism would inform Motherless that they were infringing or would make infringement apparent.

Ventura could have indicated its ownership by watermarking its videos as copyrighted, but it did not. And Ventura could have notified Motherless that the clips infringed on its copyright when it discovered them on Motherless's site, but it did not. Ventura's "decision to forgo the DMCA notice protocol 'stripped it of the most powerful evidence of a service provider's knowledge—actual notice of

infringement from the copyright holder.'"[34]  If Ventura had notified Motherless about these 33 infringing videos before filing this lawsuit and Motherless had not taken them down, then Motherless would have lost its safe harbor.  On the facts of this record, however, Ventura did not establish a genuine issue of fact as to actual knowledge.  The statutory phrase "actual knowledge" means what it says: knowledge that is actual, not merely a possible inference from ambiguous circumstances.

### ii.  Apparent Knowledge

Actual knowledge is not necessary to deprive an infringer of safe harbor.  Motherless would also lose its safe harbor if it was "aware of facts or circumstances from which infringing activity is apparent" and did not "act[] expeditiously to remove, or disable access to, the material."[35]  This is different from actual knowledge because instead of looking at subjective thoughts, we look at objective facts and circumstances from which the specific infringement would be obvious to a reasonable person.[36]  The statutory term "apparent" is often described, in the cases and secondary

---

[34] *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1020 (9th Cir. 2013) (quoting *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1107 (W.D. Wash. 2004)) (citing *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1148 (N.D. Cal. 2008)); *see also* 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12B.04[A][3], at 12B-94 (rev. ed. 2017) ("NIMMER").

[35] 17 U.S.C. § 512(c)(1)(A)(ii)–(iii).

[36] *UMG*, 718 F.3d at 1025–26; *Io Grp.*, 586 F. Supp. 2d at 1148.

literature, as "red flag" knowledge.[37] The sports metaphor is no more helpful than the statutory word "apparent," and we use the words interchangeably.

Ventura's arguments for "apparent" awareness are similar to its arguments for actual knowledge. And the same reasons for absence of knowledge apply. There is nothing about the Ventura clips that would make infringement apparent. That is not to say that Motherless did not know that infringement was probably occurring on its website. It is hard to imagine that a site with 12.6 million pictures and video clips uploaded by users would not contain some material that users had uploaded without authorization. It is also hard to imagine that Lange and his contractor would have spotted all the infringing videos with the few seconds of viewing they gave to each one.

Nevertheless, we held in *UMG* that hosting material capable of copyright protection, with the general knowledge that the site could be used to share infringing material, is not enough to impute knowledge.[38] The material in *UMG* was much more likely to arouse awareness of infringement than the material in this case, because it included music videos by well-known celebrities like 50 Cent, Avril Lavigne, and Britney Spears.[39] We held that this sort of knowledge was not enough to amount to red flag knowledge.[40]

---

[37] *See, e.g.*, NIMMER § 12B.04[A][1][b], at 12B-52 (explaining that this form of knowledge can be best described as a red flag test).

[38] *UMG*, 718 F.3d at 1022.

[39] *Id.* at 1023.

[40] *Id.*

Similarly, in *Capitol Records, LLC v. Vimeo, LLC*,[41] the Second Circuit addressed whether a service provider may be found to have apparent knowledge because it relies on mass uploading by users. Its reasoning is instructive. The service provider in *Capitol Records* was Vimeo, which operates a website that enables members to post videos that they created.[42] As of 2012, Vimeo had more than 31 million videos and 12.3 million registered users.[43] Nearly 43,000 videos were uploaded to Vimeo daily.[44] Capitol Records sued Vimeo for copyright infringement because 199 videos on the website contained recordings to which Capitol Records held the copyright.[45] The Second Circuit explained that the copyright holder must demonstrate that the service provider had actual knowledge of facts "that would make the *specific infringement claimed* objectively obvious to a reasonable person."[46] *Capitol Records* further explained that "suspicion of infringement" is not the same as "facts making infringement obvious."[47] Requiring service providers to investigate potential copyright infringement whenever they

---

[41] 826 F.3d 78 (2d Cir. 2016).

[42] *Id.* at 81.

[43] *Id.* at 84.

[44] *Id.*

[45] *Id.* at 86.

[46] *Id.* at 93 (emphasis added) (citing *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012)).

[47] *Id.* at 98.

were suspicious would undermine "an important part of the compromise embodied in the safe harbor."[48]

We agree. The copyright owner must show knowledge, actual or red flag, for the videos that infringed its copyright and are the subject of its claim. And for red flag knowledge, infringement must be apparent, not merely suspicious. Congress used the word "apparent," not "suspicious" or some equivalent. Ventura, not Lange, is in charge of policing Motherless for its copyrighted material. Congress could have put the burden of policing infringement in suspicious circumstances on the provider, but it instead put it on the copyright holder.

Because the facts and circumstances from which a reasonable person might suspect infringement were much more substantial in *UMG* than in this case, and because there we held that the infringement was not "apparent," we must reach the same conclusion here. As *UMG* implies,[49] and as the Second Circuit in *Capitol Records* expressly stated,[50] even if it were obvious to a reasonable person that some of the material on the site must be infringing, that is not enough to lose the safe harbor. It must be obvious that the particular material that is the subject of the claim is infringing. Here, it would not be obvious to a reasonable person that the clips excerpted from Ventura movies were infringing.

---

[48] *Id.*

[49] *See UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1022 (9th Cir. 2013); *see also Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1057 (9th Cir. 2017).

[50] 826 F.3d at 93 (citing *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 30–31 (2d Cir. 2012)).

Ventura argues that we should infer apparent knowledge under *Columbia Pictures Industries, Inc. v. Fung*.[51]  Fung's website used a peer-to-peer file sharing protocol.[52]  That means the content was not on the website's server, but rather on the hard drives of the users.  Clicking on a URL on the website enabled the user to get into the shared material on another user's hard drive.  Fung's website enabled users to download popular movies and television shows, not just clips but entire movies.[53]  For example, users downloaded over 1.5 million copies of the James Bond movie *Casino Royale*.[54]  The website included categories such as "Top 20 TV Shows" and "Top 20 Movies,"[55] so it was obvious that using it would enable the user to get this obviously infringing content in its entirety.  Fung solicited users to upload and download copyrighted material and assisted those seeking to watch copyrighted material, including helping downloaders burn DVDs of the infringing material.[56]  We held that Fung had apparent knowledge, because "[t]he material in question was sufficiently current and well-known that it would have been objectively obvious to a reasonable person that the material

---

[51] 710 F.3d 1020 (9th Cir. 2013).

[52] *Id.* at 1024.

[53] *Id.* at 1028–29.

[54] *Id.* at 1029.

[55] *Id.*

[56] *Id.* at 1043.

solicited and assisted was both copyrighted and not licensed to random members of the public."[57]

This case is very much like *UMG* and not at all similar to *Fung*. In *Fung*, the site marketed itself as a pirate site for free access to feature movies and top television shows, and no one could mistake the material on it for anything but infringing material. Fung had complete, long movies, but Motherless limited uploads to 500 megabytes, which would be around half or three-quarters of an hour at standard density, and much less at high density. The Ventura clips had no indication that Ventura owned the copyright—or was associated with the videos at all. Fung had "current and well-known" material, like *Casino Royale*.[58] Whoever the actors in the Ventura material may have been, they are not as famous as the actors who have played James Bond. No one could mistake *Casino Royale* for a couple of amateurs filming their own activities and purposely posting them for exhibition, but an ordinary person could mistake the Ventura clips for just that.

In *Fung*, we noted that "the record is replete with instances of Fung actively encouraging infringement, by urging his users to both upload and download particular copyrighted works."[59] Lange did not do that. His posted Terms of Use prohibited posting copyrighted material without prior written consent from the copyright owner, and he invited takedown notices for infringing material. While such

---

[57] *Id.*

[58] *Id.*

[59] *Id.*

posted notices language could be merely for appearances sake if it were not followed by action, Lange estimates that he has deleted over 180,000 videos and pictures for copyright infringement. He has removed an estimated 1,320 to 1,980 users from the site for repeated copyrighted infringement. His software stops users from re-uploading previously deleted material. Fung's was fairly explicitly a pirate website. Motherless, though, appears to be managing the website to make money while avoiding legal trouble from users posting child pornography, bestiality, or copyright infringing material.

Lastly, Ventura makes the policy argument that "[i]t is exceedingly difficult for [Ventura]—or any adult Web site, for that matter—to convince customers to pay for content that is readily available for free on the adult tube sites" such as Motherless. That may be so, but Congress, not judges, makes the policy decision on whether to offer a safe harbor from suit.

### iii. Expeditious Takedown

An additional requirement for the accidental infringer's safe harbor relief is expeditious removal of the infringing material once there is actual or red flag notice of the infringement. The statutory wording is that "upon obtaining such knowledge or awareness," the service provider must "act[] expeditiously to remove, or disable access to, the material."[60] To trigger the expeditious removal requirement, a copyright owner's notification must substantially comply with the requirements of subsection (c)(3)(A) of the safe

---

[60] 17 U.S.C. § 512(c)(1)(A)(iii).

harbor statute.[61]   Among other things, the notification must identify the infringing material with "information reasonably sufficient to permit the service provider to locate the material."[62]

In this case, the infringing videos had no Ventura identification, and the site had more than a half-million videos, so as a practical matter what Motherless needed to remove them was a URL for each.   Ventura did not send Motherless a statutory notification before filing suit.   When Lange was served with Ventura's complaint, he asked Ventura to provide him with the URLs to the infringing clips so that he could delete them.   Ventura did not initially respond.   Subsequently, Ventura provided the URLs after Lange followed up on his initial request.   Lange deleted the 33 infringing clips the same day.   That satisfied the "responds expeditiously to remove" requirement.

## C.  Right and Ability to Control

Even if subsection (c)(1)(A) is satisfied (no actual or red flag knowledge, expeditious removal), a service provider still loses its safe harbor under subsection (c)(1)(B) if it receives "a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right

---

[61] *Id.* § 512(c)(3)(B).

[62] *Id.* § 512(c)(3)(A)(iii).  This part of the statute provides that notice is effective only if it includes: "Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material."

and ability to control such activity."[63]    This raises two questions: did Motherless have "the right and ability to control" the infringing activity, and if so, did it receive a financial benefit "directly attributable to the infringing activity"?

Motherless certainly had the physical ability to control any and all infringing activity.  Lange could take down all of Motherless's content, infringing or not, and bar any uploads, infringing or not.  We have held, however, that the "'[r]ight and ability to control' involves 'something more than the ability to remove or block access to materials posted on a service provider's website.'"[64]  To have the right and ability to control, a service provider must be able to exert "substantial influence" on its users' activities.[65]

We held in *UMG* that the service provider did not have the "ability to control."[66]  In *Fung*, it did.[67]  This case is like *UMG* and not like *Fung*.  Nothing in the record suggests that Motherless told its users what to upload.  Its homepage welcomed users to "a moral free zone where anything legal

---

[63] *Id.* § 512(c)(1)(B).

[64] *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1058 (9th Cir. 2017) (quoting *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1030 (9th Cir. 2013)).

[65] *UMG*, 718 F.3d at 1030 (quoting *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 38 (2d Cir. 2012)).

[66] *Id.*

[67] *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1046 (9th Cir. 2013).

stays." It did not curate uploaded content in any meaningful way, nor did it reject unpopular groups or content. Motherless deleted only user-created groups that contained little or no content, and it started deleting bestiality content due to legality issues raised by European advertisers.

Motherless rewarded uploaders of the most popular content with points redeemable for items of negligible value, such as coffee mugs and t-shirts, but that does not amount to encouraging uploads of infringing material. Even after Motherless started letting users exchange points for cash, the payouts were nominal. One of the most prolific Motherless users (he uploaded over 300,000 files) testified that he made just $200. Except for Motherless's screening out of child pornography, bestiality pornography, and apparent infringing material, the uploaders, not Motherless, controlled what was uploaded. Such censoring by Motherless could not enable it to control uploads of non-obvious infringing material,[68] and there was nothing in the uploaded video clips to identify their infringing nature.

Nor was there any evidence that Motherless received "a financial benefit directly attributable to the infringing activity." Unlike the site in *Fung*, Motherless did not advertise itself as a place to get pirated materials. Of course, the more pornography Motherless had, the more users it would attract, and more views would lead to more advertising revenue. The words "the" and "directly" in the statute, though, must mean that some revenue has to be distinctly attributable to the infringing material at issue. There is no

---

[68] *See UMG*, 718 F.3d at 1027–28; *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008).

evidence that Motherless made any money directly from the Ventura clips.

## D. Repeat Infringer Termination

So far, we have examined the specifics of the safe harbor as applied to Ventura's movie clips. Ventura did not submit cognizable evidence establishing a genuine issue of fact as to whether Motherless was entitled to safe harbor.[69]   The evidence is uncontradicted that Motherless did not know, nor was it apparent, that its site included infringing Ventura clips. Motherless immediately removed them on the day that Ventura gave Motherless enough information to do so.  And Motherless did not control what users uploaded.   These conditions are necessary to enjoy the safe harbor.  However, they are not sufficient.

Basically, subsection (c) of the safe harbor provision aims at individual infringements, not the service as a whole.  It uses the phrase "the material"—that is, the material for which an infringement remedy is sought—in the context of setting out what a service provider needs to do to avoid liability for the infringement of the copyrighted material at issue.  Our sister circuit and we both read it this way.[70]  If subsection (c) were read to apply to all the material on the website, instead of the material for which a remedy was sought by the victim of infringement, then no large site would be protected by the

---

[69] *See* Fed. R. Civ. P. 56(c).

[70] *See UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1021–22 (9th Cir. 2013); *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 93 (2d Cir. 2016); *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012).

safe harbor. It is unimaginable that any website with hundreds of thousands or millions of user uploads could successfully screen out all of the copyright infringing uploads, or even all of the uploads where infringement was apparent.

But Congress promulgated subsection (i) to limit the eligibility for safe harbor treatment. Even if a website deletes infringing material as soon as it learns about it, the safe harbor is unavailable unless the site has a policy of excluding repeat infringers. This ineligibility provision "is a prophylactic against future acts of infringement by actors whose past conduct renders them suspect."[71]

This repeat infringer policy requirement does not focus on the particular infringement at issue. Instead, subsection (i) bars use of the subsection (c) safe harbor unless the service provider adopts and "reasonably" implements a policy of terminating repeat infringers in "appropriate" circumstances:

> (1) ACCOMMODATION OF TECHNOLOGY.—The limitations on liability established by this section shall apply to a service provider only if the service provider—
>
>> (A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account

---

[71] NIMMER § 12B.10[A][2], at 12B-168.7.

holders of the service provider's system or network who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures.

Unlike subsection (c), subsection (i) addresses how the site is generally managed, not just how the site responds to notice of a particular infringement. Without subsection (i), an unscrupulous website might take down infringing material as soon as it received a proper takedown notice identifying it, yet still operate as a pirate site. Subsection (i) obliges the provider to exclude repeat infringers, subject to its qualifications: "reasonably" and "in appropriate circumstances." In this case, subsection (i) means that if Motherless did not reasonably implement a policy of terminating in appropriate circumstances users who were repeat infringers, then innocence in hosting Ventura's works and promptness in removing them once notified would not shield Motherless from infringement remedies.

The "standard technical measures" referenced in subsection (i)(1)(B) enable copyright owners to establish some technical means so that service providers can spot and exclude infringing material without substantial expense.[72]

---

[72] "Standard technical measures" is defined in 17 U.S.C. § 512(i)(2), which states:

DEFINITION.—As used in this subsection, the term "standard technical measures" means technical measures that are used by copyright owners to identify or protect copyrighted works and—

(A) have been developed pursuant to a broad consensus

One can imagine a digital version of the old c in a circle (©) automatically triggering the uploading software to exclude material so marked by the copyright owner. But subsection (i)(1)(B) is not at issue in this case. The evidence establishes, without any genuine issue of fact, that Ventura did not in any way mark its material so that infringement could be spotted and the material excluded by some standard technical measure.

However, the inapplicability of subsection (B) to this case does not free Motherless from the burden of subsection (A). The service provider must satisfy both. Motherless has a written policy of excluding infringing material, stated on its membership sign-up page:

> • In connection with User-Submitted Content, you affirm, represent, and/or warrant that: you won or have the necessary licenses, rights, consents and permissions to use and authorize [Motherless] to use all . . . copyright . . . rights in and to any and all User-Submitted Content to enable inclusion and use of the User-Submitted Content in the manner contemplated by the [Motherless] website and these Terms of Use.

---

of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

(B) are available to any person on reasonable and nondiscriminatory terms; and

(C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

- [Motherless] and its administrators reserve the right (but not the obligation) in their sole discretion to refuse, delete, move or edit any and all Content that it deems is in violation of the law (including . . . copyright law) . . . .

- A partial list of content that is illegal or prohibited includes content that . . . Promotes an illegal or unauthorized copy of another's copyrighted work, such as pirated computer programs or links to them, or providing information to circumvent manufacturer-installed copy-protect devices, or providing pirated music or links to pirated music files . . . .

- You agree that you will not post, or otherwise distribute or facilitate distribution of any Content that . . . infringes on any . . . copyright . . . of any party . . . .

- You may not post, distribute, or reproduce in any way, any copyrighted material . . . without obtaining the prior written consent of the owner of such proprietary rights or otherwise have a valid basis under the law, including "fair use."

And Motherless has a written policy of terminating repeat infringers. On its page entitled "DMCA Notice & Takedown Policy and Procedures," Motherless said that "[it] is the firm

policy of the [site] to terminate the account of repeat copyright infringers, when appropriate."

The details of the termination policy are not written down. However, the statute does not say that the policy details must be written, just that the site must inform subscribers of "a policy" of terminating repeat infringers in appropriate circumstances. Motherless consists only of Lange and a few independent contractors, and Lange alone determines when to terminate repeat infringers.[73] A company might need a written policy to tell its employees or independent contractors what to do if there were a significant number of them, but Motherless is not such a firm. Small operations in many industries often do not have written policies because the owners who would formulate the policies are also the ones who execute it. There might not have been a need for anything in writing. So the lack of a detailed written policy is not by itself fatal to safe harbor eligibility. Neither is the fact that Motherless did not publicize its internal criteria.[74]

Lange described how he applies Motherless's repeat infringer policy in his deposition testimony. He testified that he excludes infringing material by looking for an identifying watermark in the corner, the usual way owners identify their copyrighted material. If he receives a DMCA takedown

---

[73] The dissent conflates Lange's screening of content for child pornography and bestiality before it is made available on the website, and his implementation of Motherless's policy to terminate repeat infringers. Lange does only the former with the assistance of contractors.

[74] *See Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1102 (W.D. Wash. 2004), *overruled on other grounds*, *Cosmetic Ideas, Inc. v. IAC/Interactivecorp*, 606 F.3d 612 (9th Cir. 2010); NIMMER § 12B.10[F], at 12B-195 n.195.

notice (the form designated in subsection (c)(3)(A)),[75] he

---

[75] 17 U.S.C. § 512(c)(3)(A) lists out the requirements for a notice of infringement.  The subsection reads as follows:

ELEMENTS OF NOTIFICATION.—

(A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

also uses "hashing" software so that copies of the image or clip will be removed and will be screened out if anyone tries to post them again.  Ordinarily, he will not terminate a user because of one takedown notice, but he will if there are two or more, which is to say, "repeated" instances of infringement.  He might make a "gut decision" to terminate a user after the first DMCA notice (that is, a user who is not a repeat infringer) if there are multiple infringing pictures or videos identified in the notice, though that is not his usual practice.   Motherless has received over 3,000 DMCA takedown notices.  Lange does not keep a written list of subscribers whose submissions generated DMCA notices, but he saves each of the takedown notices and can track the number of times each user's content has been deleted in response, as well as the date of and reason (e.g., copyright infringement, child pornography) for each deletion.   In deciding to terminate a user, he considers the account's history, as well as his memory and judgment.   He is especially careful to look for and screen out material from one producer who threatened to sue him for infringement.

Before removing a user, Lange considers multiple factors, as detailed above, including the number of complaints arising from the user's uploads, the amount of infringing content in the complaint he received, and whether he thinks the user had maliciously or intentionally uploaded infringing content. Lange testified at one point that Motherless had an automated system for removing repeat infringers, but he subsequently admitted that Motherless did not have such a system and may

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

have confused it with Motherless's automatic removal of content when two or more people report it for violating the Terms of Use within a 24-hour period.  Lange uses his judgment, not a mechanical test, to terminate infringers based on the volume, history, severity, and intentions behind a user's infringing content uploads.  Ventura does not dispute this.

*Perfect 10, Inc. v. CCBill LLC*[76] holds that "a service provider 'implements' a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications."  The "implementation is reasonable if, under 'appropriate circumstances,' the service provider terminates users who repeatedly or blatantly infringe copyright."[77]  A "substantial failure" to record alleged infringers may raise a genuine issue of material fact, but the maintenance of a DMCA log is adequate even if the log is not perfect.[78]  (One page of the log was not fully filled out in *CCBill*, but the log was still adequate.[79])  DMCA-compliant notices put the provider on notice of infringement, but unsworn, non-compliant complaints do not.[80]  The service provider's responses to DMCA notices from copyright holders other

---

[76] 488 F.3d 1102, 1109 (9th Cir. 2007).

[77] *Id.*

[78] *Id.* at 1110.

[79] *Id.*

[80] *Id.* at 1112–13.

than the parties to the case are relevant to assessing the provider's policy.[81]

Various factors may bear on whether a service provider has "adopted and reasonably implemented" its policy for terminating, "in appropriate circumstances," repeat infringers. Certain factors work in favor of the service provider, including: a DMCA log, as discussed in *CCBill*; blocking a subscriber's name and email address from uploads;[82] putting email addresses from terminated accounts on a banned list;[83] and prohibiting a banned user from reopening a terminated account.[84] Other factors cut against the service provider, including: changing the email address to which takedown notices are sent without providing notice of the change;[85] participating in copyright infringement;[86] allowing terminated users to rejoin the site;[87] and refusing to terminate known

---

[81] *Id.* at 1113.

[82] *See Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1143–44 (N.D. Cal. 2008).

[83] *See Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 514–16 (S.D.N.Y. 2013), *overruled in part on other grounds*, 826 F.3d 78 (2d Cir. 2012).

[84] *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1103–04 (W.D. Wash. 2004).

[85] *See Ellison v. Robertson*, 357 F.3d 1072, 1080 (9th Cir. 2004).

[86] *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 90 (2d Cir. 2016).

[87] *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 656–58 (E.D. Va. 2015).

repeat infringers.[88]    Congress did not require that, to be eligible for safe harbor, a provider must maintain a logbook of infringers which it consults whenever it receives a DMCA notice.    Congress required that the provider reasonably implement a policy of terminating repeat infringers, and the use of such a logbook and procedure would be good evidence that it did.

We conclude that on this record, there was no triable issue of fact as to whether Motherless, when it infringed on Ventura's copyrighted material, had "adopted and reasonably implemented" its policy of terminating repeat infringers "in appropriate circumstances."  No trier of fact could conclude from the evidence in the record that Motherless had failed to reasonably implement a repeat infringer policy.

As the district court pointed out, there is a paucity of proven failures to terminate.  Safe harbor eligibility does not require perfection, just "reasonable" implementation of the policy "in appropriate circumstances."  Eligibility for the safe harbor is not lost just because some repeat infringers may have slipped through the provider's net for screening them out and terminating their access.  The evidence in the record shows that Motherless terminated between 1,320 and 1,980 users for alleged copyright infringement and that only nine alleged repeat infringers had slipped through.  Of those nine, only six were before Ventura filed its lawsuit, and only four of the six had been the subject of more than one DMCA notice.[89]  That suggests that less than one repeat infringer in

---

[88] *See id.* at 659–62.

[89] *See* NIMMER § 12B.10[C][1], at 12B-178 (defining "repeat infringer").

100,000 active users was missed. If that is the extent of failure, there could be no genuine issue of material fact as to whether Motherless "reasonably implemented" its termination policy. Congress used the word "reasonable" to modify "implemented," so the phrase cannot be construed to require perfect implementation.[90]

Ventura points out that one of Motherless's biggest uploaders, Kristy7187, was not terminated until Motherless had received a fourth DMCA-compliant notice on a Kristy7187 upload. It may be hard to imagine how a site with so many subscribers and uploads could have so few repeat infringers, and how it could screen so effectively. Motherless does not even have an automated log of subscribers whose uploads generated DMCA notices. And since the policy is little more than Lange's multifactor judgment based largely on his recollection of DMCA notices, it may be hard to imagine how it could work so well. It is tempting, perhaps, to say that a policy is not "reasonably" implemented if it does not include both a database of users whose uploads have generated DMCA notices and some automated means of catching them if they do it again. But the statute does not require that. It modifies the termination requirement with the phrase "appropriate circumstances" in addition to the word "reasonable." And as the district court held, the evidence in the record allows for only one conclusion: that Motherless succeeded in reasonably implementing its policy of terminating repeated infringers. Although the dissent points out that anonymous users could also upload files, 85% of the uploads came from members, and the Ventura clips were not

---

[90] *See Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1144 (N.D. Cal. 2008); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1104 (W.D. Wash. 2004).

uploaded by anonymous users. The number of repeat infringers who escaped termination, at least as the record shows, is a tiny number and a minuscule percentage of users.

Doubt that Motherless really does have a "policy" of terminating repeat infringers that is "reasonably implemented" is unavoidable in light of unsystematic and casual implementation. But doubt is not evidence. Ventura has presented no evidence to establish a genuine issue of fact as to whether Motherless failed to reasonably implement its policy. Motherless, however, has met its burden.[91] The absence of any significant number of repeat infringers who escaped termination compels the conclusion that a trier of fact could not conclude, on the record before us, that Motherless failed to meet the repeat infringer eligibility requirement for safe harbor. Motherless and Lange are therefore entitled to claim the protection of the safe harbor.

## II.  Remaining Issues

Ventura Content argues that the district court abused its discretion in not exercising supplemental jurisdiction over its California state law claim for violation of California Business and Professional Code § 17200. The district court did not abuse its discretion.

Federal courts may exercise supplemental jurisdiction over a state law claim if it shares a "common nucleus of operative fact" with a federal claim and if "the state and

---

[91] *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1039 (9th Cir. 2013).

federal claims would normally be tried together."[92]  Ventura's state law claim is for unlawful business practices, a cause of action that "borrows violations of other laws" and makes them "independently actionable."[93]  Specifically, Ventura alleges that Motherless is violating federal law by not creating and maintaining records of the performers on its site.[94]  The district court held that this claim did not share a "common nucleus of operative fact" with the copyright infringement claim.  That was not an abuse of discretion for the very reason that the district court gave: Motherless's "failure to keep records has little, if anything, to do with the copyrighted material that appears on their system."

Likewise, the district court did not abuse its discretion by denying an award of attorney's fees to Motherless.  Among the factors bearing on the exercise of discretion are "(1) the degree of success obtained; (2) frivolousness; (3) motivation; (4) the objective unreasonableness of the losing party's legal and factual arguments; and (5) the need, in particular circumstances, to advance considerations of compensation and deterrence."[95]

---

[92] *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004).

[93] *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 539–40 (Cal. 1999)).

[94] *See* 18 U.S.C. § 2257(a) (requiring producers of media depicting sexually explicit conduct to "create and maintain individually identifiable records pertaining to every performer").

[95] *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1180–81 (9th Cir. 2013) (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

The district court noted that Ventura's claim was neither objectively unreasonable nor frivolous because prior Ninth Circuit precedent had not directly addressed several arguments that Ventura raised. Ventura's motivation was not improper, nor was there a need to deter the claims that Ventura made. It had, after all, been the victim of copyright infringement and sued parties that played a role in the infringement. It was thwarted only because of the complexities of the safe harbor rules that had not yet been fully explicated in the case law.

## CONCLUSION

The record and the law support the district court's decisions (1) granting summary judgment in favor of Motherless; (2) declining to exercise supplemental jurisdiction over Ventura Content's state-law claim; and (3) denying Motherless's motion for attorney's fees.

**AFFIRMED.**

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent from my colleagues' conclusion that Motherless, Inc. and Joshua Lange qualified for the safe harbor provided for in the Digital Millennium Copyright Act (the Act).

It is important to remember that this case was resolved on summary judgment. Therefore, if a material issue of fact was raised by Ventura Content, Ltd. (Ventura), entry of summary judgment in favor of Motherless, Inc. and Lange was in error. *See Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) ("[W]here evidence is genuinely disputed . . . that issue is inappropriate for resolution on summary judgment. The district court erred in granting summary judgment to the defendants . . .") (citations, alteration, and internal quotation marks omitted). Moreover, all evidence is to be construed in the light most favorable to Ventura. *See id*. at 440.

From my reading of the record, a gargantuan issue of fact was raised by Ventura regarding Motherless'/Lange's compliance with the requirement that the service provider adopt, implement, and inform subscribers and account holders of the policy providing for termination of repeat infringers to merit safe harbor protection from copyright infringement.

It is important to set forth the obligations imposed upon the service provider Motherless/Lange under the Act. The Act provides that the safe harbor is available to a service provider "only if the service provider" "*has adopted* and *reasonably implemented and informs subscribers and account holders* of the service provider's system or network of, a policy that provides for the termination in appropriate

circumstances . . . of repeat infringers." 17 U.S.C. § 512(i)(1)(A) (emphasis added). The Act requires not only that the service provider have a policy, but that the policy be adopted and reasonably implemented. *See id*. The subscribers and account holders of the system must also be informed of the policy.

The majority concedes that Motherless/Lange has adopted no written or publicized policy that may be used to instruct regarding the expulsion of repeat infringers. *See Majority Opinion*, pp. 7, 38–39. The majority excuses this deficiency by noting that "there are no employees to instruct." *Id*., p. 7. However, there is at least one independent contractor who, together with Lange, reviews all the photographs and videos before they are uploaded to the website. *See Majority Opinion*, p. 6. If, as the majority concedes, there is no written policy to instruct the independent contractor regarding repeat infringers, at a minimum a material issue of fact is raised regarding compliance with that requirement of the safe harbor provision.

The majority accuses me of "conflat[ing] Lange's screening of content . . . and his implementation of Motherless's policy to terminate repeat infringers." *Majority Opinion*, p. 39 n.73. I beg to differ. I readily acknowledge that the screening precedes the implementation of the "policy" to terminate repeat infringers. But how would Lange know whom to terminate if the repeat offenders are not first identified by Lange or to Lange by the contractor? That question brings us back to the lack of guidance regarding the "appropriate circumstances" for terminating repeat infringers. 17 U.S.C. § 512(a)(1)(A). If the independent contractor has no guidance for determining when to refer screened material as from a potential repeat infringer, and Lange is the only one

who actually terminates repeat offenders, a material issue of fact looms regarding the reasonableness of the Motherless/Lange system of identifying and terminating repeat infringers.  *See id*.

Further supporting the existence of a material issue of fact regarding the establishment of a policy is the failure of Lange to articulate a consistent approach to the termination of repeat infringers.  At one point Lange stated the repeat infringer policy as:  "If we receive more than one takedown notice, we terminate the account."  Lange even went so far as to describe this approach as "a written policy of Motherless."  At a different point, Lange described an "automated system for removing people" that he later acknowledged did not actually exist.

The majority has apparently settled on the third approach articulated by Lange, the "I delete any infringing content I can find" approach.  *Majority Opinion*, p. 6.  Lange described this approach as "look[ing] at about 80 thumbnails per minute" to weed out repeat infringers.  What Lange is really saying is that he looks at each thumbnail for a fraction of a second to identify repeat infringers.   Lange uses his "judgment" rather than a policy to make this determination.  *Majority Opinion*, p. 7.  And Lange never explains how, without a written policy, his "judgment" is transferred to the independent contractor who is also responsible for identifying repeat infringers.  For instance, Lange might make a "gut decision" to terminate a user after the first takedown notice.  *Majority Opinion*, p. 41.  Who can say with a straight fact that a "gut decisionmaking process" constitutes a policy?  I certainly can't.

At a minimum, Lange's inconsistent and inadequate articulation and application of the Motherless/Lange policy, such as it is, governing termination of repeat infringers precluded entry of summary judgment in favor of Motherless/Lange. *See Zetwick*, 850 F.3d at 441.

The majority relies on "the paucity of proven failures to terminate" as evidence supporting satisfaction of the safe harbor requirements. *Majority Opinion*, p. 44. But this "evidence," or more precisely, lack of evidence is singularly unpersuasive because it relies completely on the less than stellar, unautomated recordkeeping system utilized by Motherless. The missing link is how many repeat infringers slipped through the massive cracks in the Motherless/Lange casual monitoring system. And as the majority concedes, there is evidence in the record that repeat infringers slipped through these cracks. *See id*. One of the biggest uploaders to the website was not terminated until after Motherless received a fourth takedown notice under the Act. *See id*., p. 45. This circumstance raises a material issue of fact regarding the lack of implementation of one of Lange's self-described policies of terminating an account "if [Motherless] receive[s] more than one takedown notice." The failure to terminate the account of this admittedly repeat infringer certainly raised a material issue of fact regarding whether Motherless had "a policy that provides for the termination [of repeat infringers] in appropriate circumstances." 17 U.S.C. § 512(i)(1)(A); *see also Perfect 10 v. CC Bill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007) ("A policy is unreasonable . . . if the service provider failed to respond when it had knowledge of the infringement. . . .").

The majority admits that "it may be hard to imagine how a site with so many subscribers and uploads could have so

few repeat infringers, and how it could screen so effectively." *Majority Opinion*, p. 45. But the majority can only reach the conclusion that there are few repeat infringers, and that Motherless screens effectively, by impermissibly viewing the evidence in the light most favorable to Motherless rather than to Ventura. *See Zetwick*, 850 F.3d at 440. In addition to raising material issues of fact regarding the existence and implementation of the required policy, Ventura presented evidence that Motherless is completely unable to capture anonymous infringers. So how can the majority have confidence in the number of infringers who purportedly escaped termination if there is no way of knowing the actual number of infringers? This is a classic example of "garbage in, garbage out" evidence and should not permit Motherless to escape accountability under the Act for failing to adopt, disseminate, and reasonably implement a policy to terminate repeat infringers.

The safe harbor provision is basically an exception to the liability that otherwise applies under copyright law for those who harbor repeat copyright infringers. As with any other exception, its parameters should be construed narrowly. *See, e.g.*, *Federal Bureau of Investigation v. Abramson*, 465 U.S. 615, 636 n.5 (1982) (noting that exceptions to the Freedom of Information Act are to be narrowly construed). The majority concedes that Motherless' policy is comprised primarily of "little more than Lange's [unwritten] multifactor judgment based largely on his recollection of DMCA notices" and his glances at the uploads. *Majority Opinion*, p. 45. I am not prepared to say as a matter of law that a "policy" that is unwrittten, uncommunicated, and often unimplemented falls within the safe harbor provisions of the Act.

I agree with the majority that the district court acted within its discretion when it declined to exercise jurisdiction over Ventura's California state law claim and when it denied an award of attorney's fees to Motherless. However, I seriously disagree with the majority that the district court properly awarded summary judgment in favor of Motherless/Lange. Viewing the evidence in the light most favorable to Ventura, material issues of fact remain regarding the existence of a policy as defined in the Act, and the reasonableness of actions taken by Motherless/Lange to terminate repeat infringers. I would reverse that portion of the district court's ruling, and I respectfully dissent from the majority's contrary ruling.